UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RILIND DUKA, on behalf of himself and others similarly situated

                Plaintiff,

– against –

ALLIANCE TRI-STATE CONSTRUCTION, INC., ALLIANCE TRI-STATE MAINTENANCE CORP., ARGJENT DUKA and MERIMA MESIK DUKA,

                Defendants.

**OPINION & ORDER**

20 Civ. 6648 (ER)

Ramos, D.J.:

Rilind Duka ("Plaintiff") brings this collective and putative class action against Defendants Alliance Tri-State Construction, Inc., Alliance Tri-State Maintenance Corp., Argjent Duka, and Merima Mesik Duka[1] (collectively, "Defendants"), alleging violations of the Fair Labor Standards Act and New York Labor Law. Before the Court is Defendants' motion to dismiss as a sanction for Plaintiff's purported attempt to suborn perjury. For the reasons discussed, the motion is DENIED.

**I.    BACKGROUND**

Plaintiff initiated this case against Defendants on August 19, 2020 by the filing of a class and collective action complaint, and subsequent first amended class and collective action complaint ("FAC") on November 2, 2020. *See* Doc. 1; Doc. 14. The FAC alleges Defendants violated the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL") by failing to pay him overtime wages for work performed in excess of forty hours each week. Doc. 14 ¶¶

---

[1] Plaintiff is a distant family member of Defendant Argjent Duka; Merima Mesik Duka is Argjent Duka's wife. Doc. 33 ¶ 1; Doc. 14 ¶ 38.

1-2.  Plaintiff further brings claims pursuant to the NYLL for unpaid minimum wages, unpaid spread-of-hours premium, unlawful wage deduction, and the late payment of wages.  *Id.* ¶ 2. Plaintiff also brings an action as a third-party beneficiary of various public works contracts for Defendants' failure to pay him prevailing wages.  *Id.* ¶¶ 77-83.

Specifically, the FAC alleges that Plaintiff worked for Defendants' roofing company as a laborer from January 1, 2015 until December 15, 2017, Doc. 14 ¶ 67, and was paid a fixed daily rate of $175 in a combination of cash and check.  *Id.* ¶ 74.  Plaintiff alleges he was required to work long hours, often under extreme weather conditions and that, despite Plaintiff working well over forty hours per week, Defendants failed to pay him any overtime wages.  *Id.* ¶ 74.  Plaintiff further alleges he was not paid his wages for months at a time, and would sometimes have to wait several months before receiving his pay.  *Id.* ¶ 76.  Finally, Plaintiff identifies multiple public works sites at which he performed labor.  *Id.* ¶ 81.  Despite this, Plaintiff claims he was not paid at the applicable prevailing wage rate, nor did he receive the required supplemental benefits.  *Id.* ¶ 83.

When Plaintiff began working for Defendants in January 2015, the majority of Defendants' employees were members of the union, Roofers Local 8.  Doc 1. ¶ 69.  Plaintiff alleges his employer, Argjent Duka, told him that if he worked hard, he would one day be able to join the union.  Doc. 33 ¶¶ 6-7.  Though Plaintiff worked long hours, at times as many as sixteen hours per day, Defendants never arranged for him to join the union.  *Id*. ¶ 8.  Though Plaintiff alleges he worked alongside Local 8 members at various public work sites, Defendants continued to pay him $175 per day, rather than the applicable prevailing wage rate.  *Id.* ¶ 8-9.  Plaintiff further alleges Argjent Duka told him that if someone from the union came to the job site, he should hide or run away.  *Id.* ¶ 10.  During the course of his employment, Plaintiff took multiple

photos and videos of the public work sites where he worked; Plaintiff submitted these as attachments to his declaration.

Defendants base their motion on a single interaction between Plaintiff and Razi Imerovski. *See* Doc. 31 at 3. Plaintiff first met Imerovski in 2009 or 2010, when Imerovski was working with Plaintiff's father at a construction company. Doc. 33 ¶ 13. According to Plaintiff, early on in his employment, Argjent Duka would tell him that he needed more workers who were willing to work under a similar arrangement as Plaintiff. *Id*. ¶ 14. In approximately December 2015, Plaintiff met with Imerovski and offered to drive him to his job site, so that he could speak with Argjent Duka about working for Defendants. *Id*. ¶ 15. Imerovksi agreed and thereafter started working for Defendants as a non-union cash employee, like Plaintiff. *Id.* 15-16.

Plaintiff alleges that not long after Imerovski started working for Defendants, Plaintiff learned of his "drug addiction problems." Doc. 36 at 4; Doc. 33 ¶ 17. Plaintiff alleges Imerovski would constantly ask to borrow money to purchase drugs, and while under the influence of drugs, engaged in "extreme and reckless behavior" and would not sleep for days. Doc. 36 at 4; Doc. 33 ¶¶ 17-18. According to Imerovski's brother-in-law, Liman Vrlaku, Imerovski's "drug addiction problems have completely taken over his life." Doc. 34 ¶ 4. As a result, Vrlaku alleges, Imerovski is unable to "take care of himself" or "keep a steady job." *Id.* His "drug abuse problems have also greatly strained his marriage," as well as his relationship with his children. *Id.* Vrlaku also alleges Imerovski "has a problem with lying," and has "lost touch with reality." *Id*. ¶ 5.

On January 14, 2021, the parties participated in a mediation pursuant to the S.D.N.Y. Meditation Program. Plaintiff alleges that, following mediation, he decided to reach out to some

3

of his former co-workers, who he understood were also paid in cash, to see if they were interested in joining the case as co-plaintiffs. Doc. 33 ¶ 27. Plaintiff alleges he had three former co-workers in mind, including Imerovski. *Id.* Plaintiff and Imerovski spoke via Instagram that evening. *Id.* ¶ 28. According to Plaintiff, during that call, he discussed his case with Imerovski and suggested Imerovksi bring his own claims against Defendants. *Id.* Plaintiff alleges that Imerovski expressed interest and agreed to meet him at his house to further discuss. Imerovski then texted Plaintiff his address and a photo of his house. Doc. 33-6. When Plaintiff arrived, he sent a text message in Albanian telling Imerovski to come out. *Id.* Imerovski then walked out of his house and into Plaintiff's car. Doc. 33 ¶ 30. Plaintiff again asked Imerovski if he was interested in joining the case; Imerovski responded that he did not want to get involved. *Id.* Plaintiff alleges he told Imerovski that he should think about it, and asked that at a minimum Imerovski come to court to testify about Plaintiff's employment for Defendants. *Id.*

Defendants, on the other hand, allege that on January 14, 2021, after mediation, Plaintiff spoke with Imerovski and asked him to "fabricate his testimony to benefit Plaintiff's legal position." Doc. 31 at 5-6. According to Defendants, Imerovski declined. *Id.* at 6. Then, Defendants allege, Plaintiff told Imerovski that he would pay him $10,000 for testifying on his behalf; Imerovski declined again. *Id.* While in his sworn declaration on February 11, Imerovski alleges he and Plaintiff met in person at his home on January 14, his earlier statement—attached to Defendants' January 15 pre-motion letter—alleges Plaintiff offered him $10,000 over the phone, not at an in-person meeting. Doc. 32 ¶ 4-6; Doc. 23-1. Plaintiff denies that he offered Imerovski any money in return for his testimony. Doc. 36 at 6.

The next day, on January 15, 2021, Imerovski sent a text message to Plaintiff, "Sorry I'm not going to see the lawyer and I will don't wanna get involved [*sic*]." Doc. 33-6. Plaintiff

4

responded, "No problem I got to other people." *Id.* Plaintiff alleges this was a typo, and that he intended to say, "No problem, I got *two* other people," referring to the two other former co-workers he intended to contact about joining the case as co-plaintiffs or serving as witnesses. Doc. 36 at 6.

In addition to Imerovski, Plaintiff alleges he only spoke with one other potential witness, Slawomir Szymacha, a site supervisor who observed Plaintiff working at public works job sites. Doc. 36 at 6. Syzmacha submitted a declaration confirming that Plaintiff did not threaten him or offer him anything of value in return for his potential testimony. *See* Doc 35. Plaintiff alleges he did not speak to anyone other than Imerovski and Szymacha about joining the lawsuit or serving as a witness in this case. Doc. 36 at 6.

On January 15, 2021, Defendants filed their pre-motion letter, in advance of a motion for sanctions. A pre-motion conference was held before the Court on January 28, 2021. The Court granted Defendants leave to file their motion. Defendants moved for sanctions on February 11, 2021.

## II.     LEGAL STANDARD

Fed. R. Civ. P. Rule 37(b)(2) provides for the possibility of sanctions where a party or party's representative "fails to obey an order to provide or permit discovery." Fed. R. Civ. P. 37(b)(2)(A). Sanctions authorized by Rule 37 include "dismiss[al of] the action in whole or in part." Fed. R. Civ. P. 37(b)(2)(A)(v). Rule 37 is "intended to encourage and enforce strict adherence to the 'responsibilities counsel owe to the Court and to their opponents . . .'" *Metro. Opera Ass'n, Inc. v. Local 100, Hotel Employees and Rest. Employees Int'l Union*, 212 F.R.D. 178, 219 (S.D.N.Y. 2003) (quoting *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S.

639, 640 (1976)). A court has "broad discretion in fashioning an appropriate sanction" under Rule 37. *See Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 107 (2d Cir. 2002); *Metro. Opera*, 212 F.R.D. at 219 ("There are no specific requirements for the imposition of sanctions under Rule 37; rather, the decision is left to the sound discretion of the trial court."). In exercising its discretion under Rule 37, a court should consider "(1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance; and (4) whether the non-compliant party had been warned of the consequences of noncompliance." *S.E.C. v. Setteducate*, 419 Fed. App'x. 23, 24 (2d Cir. 2011) (quoting *Agiwal v. Mid Island Mortg. Corp.*, 555 F.3d 298, 302 (2d Cir. 2009)).

"[A] court should always impose the least harsh sanction that can provide an adequate remedy." *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Securities, LLC*, 685 F. Supp. 2d 456, 469 (S.D.N.Y. 2010). "The choices include—from least harsh to most harsh—further discovery, cost-shifting fines, special jury instructions, preclusion, and the entry of default judgment or dismissal (terminating sanctions)." *Id*. A terminating sanction is a "drastic remedy" that "should be imposed only in extreme circumstances, usually after consideration of alternative, less drastic sanctions." *John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.*, 845 F.2d 1172, 1176 (2d Cir. 1988); *see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991) (dismissal with prejudice is "a particularly severe sanction"); *Pension*, 685 F. Supp. 2d at 469-70 ("[A] terminating sanction is justified only in the most egregious cases, such as where a party has engaged in perjury, tampering with evidence, or intentionally destroying evidence by burning, shredding, or wiping out computer hard drives.").

### III.   DISCUSSION

#### A. Terminating Sanctions

Defendants move for terminating sanctions for Plaintiff's "intentional and unlawful attempt to influence the testimony of a non-party witness, Razi Imerovski," and "the bribery of others." Doc. 31 at 3. Defendants argue that Plaintiff's alleged conduct—namely his conversation with Imerovski and his text message that he "got to other people"—constitutes "bad faith litigation conduct" and an attempt to "corrupt the judicial process." Doc. 31 at 9-10. This "intentional bad faith conduct of the most egregious kind," Defendants argue, "warrant[s] the harsh sanction of Dismissal . . .". *Id.* at 11. In particular, Defendants argue that Plaintiff's alleged conduct has "polluted and otherwise tainted witnesses to the point where there are no lesser sanctions available other than terminating sanctions." *Id*. at 3.[2]

In support of their motion, Defendants rely on *McMunn v. Memorial Sloan-Kettering Cancer Ctr.*, 191 F. Supp. 2d 440 (S.D.N.Y. 2002), where the court imposed terminating sanctions—dismissing the case with prejudice and without reaching the merits—for plaintiff's "fraud upon th[e] Court." 191 F. Supp. 2d at 461. Fraud upon the court is "fraud which seriously affects the integrity of the normal process of adjudication." *Gleason v. Jandrucko*, 860 F.2d 556, 559 (2d Cir. 1988). As the *McMunn* court makes clear, "[i]t is well-settled . . . that an isolated instance of perjury, standing alone, will not constitute a fraud upon the court." *McMunn*, 191 F. Supp. 2d at 445. "Rather, fraud upon the court 'occurs where a party has acted knowingly in an attempt to hinder the fact finder's fair adjudication of the case and his adversary's defense of the action.'" *Id.* (quoting *Skywark v. Isaacson*, No. 96 Civ. 2815 (JFK), 1999 WL 1489038, at *14 (S.D.N.Y. Oct. 14, 1999)). In other words, a fraud upon the court

> occurs where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial

---

[2] Defendants also argue that Plaintiff's 2016 arrest and conviction for assault suggest he has a "history of violence," and that this history is relevant to their motion. Doc. 31. At 4-5. As the arrest and conviction are unrelated to the allegations at issue, the Court does not consider them.

7

> system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense.

*McMunn*, 181 F. Supp. 2d at 445 (quoting *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1118 (1st Cir. 1989)).

In *McMunn*, the court found through clear and convincing evidence that the plaintiff perpetrated a fraud upon the court when she made multiple false statements in her deposition, intentionally concealed material evidence, failed to disclose the identity of material witnesses in interrogatories and in her deposition, provided false statements to the court, deliberately edited audio recordings and lied to the court about the recordings being edited, engaged in a sham real estate transaction and then falsely testified that she was homeless. *McMunn*, 191 F. Supp. 2d at 454-462. In light of the severity of the sanction and "in an effort to protect Ms. McMunn's procedural rights," the *McMunn* court applied a "'clear and convincing' standard to any findings of fact . . .". *Id.* at 445 (citing *Shepherd v. Am. Broad. Cos., Inc.*, 62 F.3d 1469, 1477 (D.C.Cir. 1995) (to dismiss suit for abusive behavior under inherent power, district court must find by "clear and convincing evidence" that abusive behavior occurred.)); *see also Rybner v. Cannon Design, Inc.*, 1996 WL 470668, at *4 (S.D.N.Y. Aug. 20, 1996) (sanctioning plaintiff where "defendants have proven by clear and convincing evidence that [he] acted intentionally, willfully, and in bad faith").

The *McMunn* court found that the plaintiff engaged in a "pattern" of "outrageous misbehavior"—namely, intentionally and repeatedly lying to the court and concealing and distorting evidence. *McMunn*, 191 F. Supp. 2d at 454-462; *see also Esposito v. Suffolk Cty. Cmty. Coll.*, 390 F. Supp. 3d 428, 431 (declining to dismiss as sanctions where plaintiff engaged in isolated incident of "duplicitous behavior," and noting courts in this circuit generally reserve

terminating sanctions for "malfeasants . . . engaged in prolonged and repetitive campaigns of egregious conduct . . ."); *Shangold v. Walt Disney Co.*, No. 03 Civ. 9522 (WHP), 2006 WL 71672, at *5 (S.D.N.Y. Jan. 12, 2006) (dismissing claims where plaintiffs engaged in a "prolonged and calculated" scheme to fabricate evidence and manipulate the judicial process); *Civil v. New York City Dep't of Corr.*, No. 91 Civ. 2946 (SS), 1993 WL 51156, at *2 (S.D.N.Y. Feb. 23, 1993) (party's "repeated disdain for the orders of the Court and for his adversary" and "willful disregard for the integrity of the judicial process"—including ignoring court deadlines and failing to appear at scheduled conferences—warranted dismissal); *Wilson v. Pasquale's DaMarino's, Inc.*, 10 Civ. 2709 (PGG), 2013 WL 1195603, at *7 (S.D.N.Y. March 25, 2013) (entering judgment against defendants where misconduct was willful, continued for more than two years, and defendants were warned about the consequences of their misconduct).

In the instant case, Defendants cannot establish through clear and convincing evidence that Plaintiff engaged in a "pattern of misbehavior," *McMunn*, 191 F. Supp. 2d at 461, or "some unconscionable scheme" to "interfere with the judicial system's ability impartially to adjudicate a matter . . .". *Id.* at 445 (internal citations omitted).  Here, Defendants allege Plaintiff attempted to bribe Imerovski to testify on his behalf, and in support of this allegation rely only on testimony from Imerovski and on text messages between Imerovski and Plaintiff.  As Plaintiff argues, Imerovski's sworn declaration, dated February 11, 2021 and attached to Defendants' motion, is inconsistent with Imerovski's written statement, dated January 15, 2021 (the day after the conversation between Plaintiff and Imerovski) and attached to Defendants' pre-motion letter. In his January 15 statement, Imerovski alleges Plaintiff called him and offered him $10,000 to be his witness and "falsely testify against" Defendants; Imerovski alleges he refused and Plaintiff "hung up the phone."  Doc. 23-1.  In his February 11 declaration, Imerovski alleges Plaintiff

9

asked him to testify and offered him $10,000 at an in-person meeting in Imerovksi's house, not over the phone. Doc. 32 ¶ 4-6. Beyond this, the text messages do not by clear and convincing evidence suggest wrongdoing and instead are consistent with Plaintiff's allegations that he sought to ask Imerovski to join him as a co-plaintiff or serve as a witness. Imerovski's declaration and the text messages are insufficient to demonstrate clearly and convincingly that Plaintiff sought to bribe Imerovski to falsely testify on his behalf.

Even if Defendants could show through clear and convincing evidence that Plaintiff solicited false testimony from Imerovski, such conduct is an isolated incident—not part of a pattern, scheme, or prolonged campaign of misconduct. As such, it cannot rise to the level of "fraud upon the court," and dismissal is unwarranted.[3]

### B. Attorney's Fees

Defendants request "leave of court to move for reasonable attorney's fees for the cost of having to bring this motion . . ." Doc. 31 at 12. Defendants do not cite a rule or statute pursuant to which they are entitled to fees. Under the Federal Rules of Civil Procedure, a court, if warranted, "may award to the prevailing party the reasonable costs and expenses, including attorney's fees, incurred" for a motion for sanctions. Fed. R. Civ. P. 11(c)(2). As Defendants are not the prevailing party, they are not entitled to attorney's fees.

### IV. CONCLUSION

For the reasons set forth above, the Defendants' motion for terminating sanctions is DENIED. The parties are directed to attend a telephonic initial pretrial conference on November

---

[3] Defendants do not ask for other sanctions, and, indeed, argue that "lesser sanctions would be inadequate." Doc. 31 at 3. In any event, on the contested record before the Court, no other sanctions would be appropriate.

5, 2021 at 9:30am.  The parties are to dial (877) 411-9748 and enter access code 3029857# when prompted.  The Clerk of Court is respectfully directed to terminate the motion, Doc. 29.


It is SO ORDERED.

Dated:  September 29, 2021
        New York, New York

                                                     Edgardo Ramos, U.S.D.J.